POLLY AND JANE, The (UNITED STATES v.). See Case No. 16,063.

POLLY AND KITTY, The (RICE v.). See Case No. 11,754.

POLLY AND NANCY, The (UNITED STATES v.). See Case No. 16,064.

---

## Case No. 11,257.

### POLYDORE v. PRINCE.

[1 Ware (402) 411.] [1]

District Court, D. Maine. Aug. 21, 1837.

ADMIRALTY — SECURITY FOR COSTS — WAIVER OF RULE—POVERTY OF LIBELLANT—CIVIL DISQUALIFICATIONS BY LAW OF DOMICIL—SLAVERY—EFFECT.

1. The rule of the court requiring the libellant to give security for costs, is established for the benefit of the other party which he may waive at his pleasure.

2. If the libellant, in consequence of poverty, is unable to find sureties, his juratory caution will be taken instead of a stipulation with sureties.

[Cited in The Georgeanna, 31 Fed. 406; The Phœnix, 36 Fed. 272.]

3. Civil incapacities and disqualifications by which a person is affected, by the law of his domicil, are regarded in other countries as to acts done, or rights acquired in the place of his domicil, but not as to acts done, or rights acquired within another jurisdiction, where no such disqualifications are acknowledged.

[Cited in Ross v. Ross, 129 Mass. 246; Davidson v. City of Portland, 69 Me. 116.]

4. A person who is a slave by the law of his domicil, may maintain an action in his own name, in a country where slavery is not allowed, for a personal tort committed within that jurisdiction.

This was a libel for an assault and battery committed by the master on a passenger, on a voyage from Guadaloupe to Portland. It appeared from the evidence that the libellant was a slave in Guadaloupe, that he was put on board the vessel by his master, Mons. Bercier, in company with his son, Eugene, a youth of about seventeen years of age, whom he was to attend during his residence in this country, as his servant. One morning, some days after they had been at sea, the captain ordered Polydore to clean out a hen-coop, in which there were some live fowls. Polydore refused, and the captain in his answer, says, that he behaved otherwise insolently to him, and the testimony of some of the witnesses confirms his statement. But it is also in proof, that Polydore did not understand a word of English, nor did the master understand much more of French. It is also alleged by the master that in consequence of his taking Polydore at a low rate of passage money, he receiving sixty francs for Polydore and one hundred and fifty for Eugene, that Polydore was to perform such service in relation to Bercier, and also such service on board the vessel as might be properly required of him; that the fowls were for Eugene, and that it was Polydore's busi-

ness to attend to them. But there is no proof in support of the first part of this allegation, and it appears in point of fact, that the fowls instead of being exclusively for Eugene, were used as a common stock on board the vessel. Upon the refusal of Polydore to do the service that he was ordered, the captain gave him a pretty severe flogging with a piece of dry twisted cowhide; some days afterwards, the cowhide was abstracted from the cabin and not to be found; on the captain's inquiring for it, he was told that Polydore had taken it and thrown it overboard, when in fact it had been taken and secreted by Eugene for the purpose of bringing it to this country and exhibiting it in court, as the instrument with which Polydore had been flogged. Both Eugene and Polydore concurred in deceiving the captain. The captain then gave Polydore another flogging with a small rope.

Codman & Fox, for libellant.

C. S. Daveis, for respondent.

WARE, District Judge. Several objections have been taken and learnedly argued by the counsel for the respondent, to the libellant's right to maintain this action. In the first place it is contended that he has not acquired a standing in court, by entering into the usual stipulation for costs, which was called for by the respondent when the libel was entered. By the rules of this court (rule 33), the respondent may always call for this stipulation, which the libellant is required to give, under the pain of having his libel dismissed; and this rule is in conformity with the ancient practice of the admiralty. Clerke. Praxis, Adm. tits. 11, 14; 2 Brown, Civ. & Adm. Law, 410. The stipulation ordinarily required is that with sureties or fidejussors. But this stipulation is never required of seamen, as it would seldom be in their power to obtain sureties, on account of their poverty; and to exact it of them would be equivalent to a denial of justice. It is said that the ground on which this rule of the court is waived in favor of seamen, is that they are a favored class in the admiralty. But the true reason why this rule is not enforced against them, is not because they have a claim to any special favor in this respect, but because they are usually unable to comply with it; and whenever the same reason exists, the same indulgence is, by the ordinary practice of the admiralty, shown to others. In all courts proceeding according to the course of the civil law, when a party is poor, and unable to obtain fidejussors the court will receive the juratory caution instead of a stipulation with sureties. Clerke, Praxis, Adm. art. 5. The libellant in this case is a servant, a slave in his own country, with no other friend or acquaintance here, than a minor, whom he attends in the quality of a servant. To require of him to enter into a stipulation for costs with sureties, would be the same thing in effect as saying that he had no right to ask redress in this court.

It was on this ground that the motion of the respondent's counsel for a stipulation with sureties for costs, was overruled by the court. It is then said, that it was necessary for the libellant to tender the juratory caution in order to place himself rectus in curia. There is some misunderstanding between the opposing counsel, whether this tender was made or not. In the view which I take of the case, it is immaterial. The rule requiring a stipulation for costs, is a rule established for the benefit of the opposite party, which he may waive as he may any other right. And the principle applies to this as to other cases, "Quisque potest renuntiare jure pro se introducto." It is for the party to move for the security, if he wishes for it; and if he is silent it is considered as waived.

Another objection has been raised and learnedly argued by the respondent's counsel, which requires a more grave and mature consideration. It is founded on the supposed personal incapacity of the libellant to maintain any action in a court of justice, under any circumstances. It is alleged in the answer as a substantive ground of defence, and the fact is admitted on the other side that the libellant, in his own country, is a slave, and as such, incapable of appearing as a party in any court of justice; and it is contended that this personal incapacity upon the received principles of the jus gentium, or at least on the principles of national comity, follows him into whatever country he may voluntarily go or be carried by his master. The argument is, that the institution of personal servitude, however contrary it may be to natural right, is an institution admitted and acknowledged by the law of nations; that every nation having the exclusive right to regulate its own internal polity, and to determine the personal state or capacity of its members, all other nations are bound by the jus gentium, or by national comity, to take notice of, and recognize this personal status as it would be recognized in the forum of their original domicil, while they remain members of that community; that personal qualities impressed upon them by the law of their original domicil as to their civil capacities, or incapacities, travel with them wherever they go, until their legal connection with that country is dissolved.

I have stated the position of the counsel in its broadest and most comprehensive terms, and it is not to be disguised that it involves questions of serious difficulty, upon which there is no little diversity of opinion among the most eminent jurists, and on which there is not certainly an entire agreement in the practice of different nations. The whole subject is examined with all the learning which belongs to it by Mr. Justice Story, in his very learned and profound treatise on the Conflict of Laws (chapter 4). It may there be seen how many curious and perplexing questions may arise out of the conflicting laws of different nations, relating to the state or capacity of persons; questions which must often occur for discussion in the forum, and judicial decision, in an age of such constant intercourse and intercommunication for the purpose of business and pleasure among all civilized and commercial nations as the present. It may also be seen how much diversity and contrariety of opinion exists among the most celebrated and learned jurists on this subject. It is a large chapter, says Lord Stowell, and full of many difficult questions, that treats of such diversities in the writings of the civilians.

The general doctrine of foreign jurists seems to be, that the state of the person, that is, his legal capacity to do, or not to do, certain acts is to be determined by the law of his domicil, so that if he has by that law, the free administration of his goods, or the right to maintain an action in a court of justice there, he has the same capacity everywhere; and if that capacity is denied to him by the law of his domicil, it is denied everywhere; that the laws determining the civil qualities of the person, called by the foreign jurists personal statutes, follow the person wherever he goes, as the shadow follows the body, and adhere to him like the color of the skin which is impressed by the climate. Personal statutes are those which relate primarily to the person, and determine the civil privileges and disabilities, the legal capacity or incapacity of the individual, and do not affect his goods, but as they are accessory to the person. Such are those which relate to birth, legitimacy, freedom, majority or minority, capacity to enter into contracts, to make a will, to be a party to an action in a court of justice, with others of the like kind. Repertoire de Jurisprudence, mot "Statut." According to this principle, a person who is a major or a minor, a slave or a freeman, has, or has not a capacity to appear as a party to an action in a court of justice, stare in judicio, in his own country, has the same capacities and disabilities wherever he may be. The Code Napoleon has erected what seems to be the prevailing doctrine among the continental civilians into a positive law. "The laws concerning the state or capacity of persons govern Frenchmen, even when residing in a foreign country." Code Civile, art. 3. If this general principle is to be received without qualification, it would seem to decide the present case at once, for it is admitted that in Guadaloupe where the libellant has his domicil, he can maintain no action in a court of justice. But though the principle is stated in these broad and general terms, yet when it is brought to a practical application in its various modifications, in the actual business of life, it is found to be qualified by so many exceptions and limitations, that the principle itself is stripped of a great part of its imposing authority. No nation, it is believed, ever gave it effect in its practical jurisprudence, in its whole extent. Among these personal statutes, for which this ubiquity is claimed, are those which formerly over the whole of Europe, and still over a

large part of it, divide the people into different castes, as nobles and plebeians, clergy and laity. The favored classes were entitled to many personal privileges and immunities particularly beneficial and honorable to themselves. It cannot be supposed that these immunities would be allowed in a country which admitted no such distinctions in its domestic policy. If a bill in equity were filed in one of our courts against an English nobleman temporarily resident here, would he be allowed to put in an answer upon his honor, and not under oath, because he was entitled to that personal privilege in the forum of his domicil? I apprehend not. In like manner the disqualification and incapacities, by which persons may be affected by the municipal institutions of their own country, will not be recognized against them in countries by whose laws no such disqualifications are acknowledged. In England a person who has incurred the penalties of a premunire, or has suffered the process of outlawry against him, can maintain no action for the recovery of a debt, or the redress of a personal wrong. But would it be contended that because he could not maintain an action in the forum of his domicil he could have no remedy on a contract entered into, or a tort done to him within our jurisdiction? The reasons upon which an action is denied him in the forum of his domicil are peculiar to that country, and have no application within another jurisdiction. The incapacity is created for causes that relate entirely to the domestic and internal polity of that country. As soon as he has passed beyond its territorial limits, the reason of his incapacity ceases to operate, and in justice the incapacity should cease also.

Every nation has a perfect right to establish for itself its own forms of internal polity, and to determine the state and condition, the civil capacities and incapacities of its own members. Besides these personal laws determining the state and condition of individuals which are founded on natural relations and qualities, and such as are universally recognized among civilized communities, as those of parent and child, those resulting from marriage, from intellectual imbecility, and the like they may and in point of fact do establish distinctions which are not founded in nature, but relate only to the peculiarities of their own social organization, to their own municipal laws, and to the artificial forms of society, which are established among themselves. Now it is freely admitted that other nations are bound by the jus gentium to admit the validity of all those personal statutes of other communities establishing such distinctions among their members, whether natural or artificial, to a certain extent. Their validity will be admitted, and they will be enforced by the tribunals of other countries, as to acts which are done, and rights which are acquired within the territorial limits of the community where these laws are established. There they have a legal, and other nations are bound to admit, certainly as a general rule, a rightful authority. But it is by no means so clear that those personal distinctions which are not founded in nature, and are the result of mere civil institutions, can be allowed to accompany them, and give them personal immunities, or affect them with personal incapacities in other countries in which they may be temporarily resident or transiently passing, whose laws acknowledge no such distinction. The law of the place where a person is for the time being, as to acts done, or rights acquired within that jurisdiction, it would seem, ought to prevail so far as his civil rights depend on his personal status. For these personal statutes, establishing distinctions between individuals as to their civil qualities, have a direct relation to public order, and, as is remarked by one of the most eminent living jurists in continental Europe, "every person who establishes his dwelling in a country, or it may be added who is transiently within it, is bound to conform to the measures which the local law prescribes, in the interest of public decorum and good morals." Merl. Repert. "Effet Retroactif," sect. 3, § 2, art. 5. The observation is applied to the case of a married woman. If by the law of her domicil she is authorized to make valid contracts, and to maintain an action in a court of justice in her own name without the authorization of her husband, and she removes to a country by whose laws this power is denied to married women, she will not carry with her into her new residence the capacity to contract, to plead, and to be impleaded in a court of justice as she is allowed by the law of her domicil, this capacity being denied by the local law, as offensive to good-manners. If a person happens to transfer his residence to a country where the same personal distinctions are established, as are allowed in his own domestic forum, it is not intended to be denied, but that the tribunals of this country may allow him his personal immunities or affect him with the personal incapacity of his domicil; but it will, I apprehend, be according to the local law, and not according to the law of his domicil. If a Turkish or Hindoo husband were travelling in this country with his wife, or temporarily resident here, we should, without hesitation, acknowledge the relation of husband and wife between them; but the legal pre-eminence of the husband as to acts done here, would be admitted only to the extent that the marital rights are recognized by our laws, and not as they are recognized by the law of his domicil. If a Roman father, or a father from any country which had adopted the Roman law of paternal power, were travelling in this country with a minor child, we should acknowledge the relation of parent and child, but we should admit, I presume, as a general rule, the exercise of the paternal power no further than as it is authorized by our own law. If

a foreigner, in whose country slavery is established, were temporarily resident in Virginia, where slavery also exists, and had brought with him a slave as a servant, a court sitting in Virginia might, I suppose, recognize the relation of master and slave, because that is a relation known to the local law, but it would limit the exercise of the master's authority over his slave, by their own law, and not by the law of the master's domicil.

It is among the first maxims of the jus gentium that the legislative power of every nation is confined to its own territorial limits. This is a principle which results directly and necessarily from the independence of nations. Whatever may be the nature of the law, whether it relates purely to persons and their civil qualities, or to things, it can, proprio vigore, have no force within the territorial limits of another nation. It follows that the peculiar personal status, as to his capacities or incapacities, which an individual derives from the law of his domicil, and which are imparted only by that law, is suspended when he gets beyond the sphere in which that law is in force. And when he passes into another jurisdiction his personal status becomes immediately affected by a new law, and he has those personal capacities only which the local law allows. The civil capacities and incapacities with which he is affected by the law of his domicil, cannot avail either for his benefit or to his prejudice, any further than as they are coincident with those recognized by the local law, or as that community may, on principles of national comity, choose to adopt the foreign law. Though the civilians, as has been observed, generally, hold that the law of the domicil should govern as to the personal status, it is by no means true that they are universally agreed. Voet, one of the most eminent, of whom it has been said that by his clearness and logic he merits the title of the geometer of jurisprudence (Merl. Quest. de Droit Confession, § 2, note 1), after stating that such is the opinion of the majority, "plurium opinio," gives his own opinion in decisive terms, that personal statutes, as well as those relating to things, are limited in their operation to the country by which they are established; and he supports his opinion by the authority of the Roman law, as well as by that plain and obvious axiom of the jus gentium, that the legislative power of every government is confined to its own territorial limits. Ad Pand. lib. 1, tit. 4, pt. 2, notes 5, 7, 8. Gail, who has been styled the Papinian of Germany, maintains the same opinion in terms equally positive. Pract. Obs. lib. 8, Obs. 122, note 11.

The inconveniences which would result from a practical adoption of the principle that the law of the domicil must prevail, which determines the personal status of the individual, wherever he may be, would be found to be very great. If we admit that a foreigner has all those personal capacities and civil qualities in this country which the law of his domicil allows, to be consistent and follow out the principle we must adopt all those subsidiary laws of his domicil which regulate and protect him in the enjoyment of his personal status. If, for example, we acknowledge the relation of master and slave, our law should, in consistency, arm the master with the authority to govern his slave, with the power of disposing of his person and labor, which he enjoys by the law of his own country. It would be a mockery to acknowledge the relation of master and slave and to deny all the legal consequences which that relation imports. If we adopt the artificial distinctions of other nations with regard to their subjects, when they are temporarily resident among us, it would seem that we must also adopt that part of their laws which regulate those artificial relations, and the rights and duties which result from them. Natural relations of foreigners, and such as are established by our own domestic institutions, we recognize in foreigners who are temporarily resident among us; but the rights and obligations which flow from them must, as a general rule at least, be determined by our own law, and be enforced by such means only as the local law allows. But those merely artificial distinctions, those capacities and disqualifications of mere positive institution, established by different communities among their members, which are not founded in nature but which relate to their own domestic economy, their municipal institutions, and their peculiar social organization, cannot be admitted to follow them into other nations in whose laws such distinctions are unknown, without disturbing the whole order of society, and introducing into communities privileged castes of persons, each governed to a considerable extent by different laws and affected by personal privileges peculiar to themselves, and totally at variance with the habits, social order, and the laws of the community among whom they reside.

I have thus far considered the subject as it was presented in one branch of the argument, as purely a question of the jus gentium, to which the same considerations will apply whether it be raised in one country or another, and I come to the conclusion that the libellant is not disqualified from maintaining an action for a personal tort committed within our jurisdiction, merely because he is by the laws of his own country rendered incapable of maintaining an action in the forum of his domicil. And that conclusion will be fortified by recurring to our own domestic jurisprudence. It is stated by Mr. Justice Story as one of the rules which appear to be best established by the jurisprudence of this country and England, that personal disqualifications, not arising from the law of nature but from the principles of

the positive or customary law of a foreign country, are not generally regarded in other countries where the like disqualifications do not exist. Confl. Laws, 97. It is now fully settled in England, though it was once a doubtful question, that if a minor, who is disqualified from entering into the marriage contract without the consent of his guardian, goes into Scotland, where a minor has that capacity without such consent, and is married conformably to the laws of Scotland, the contract will be held valid and binding by the law of England. Compton v. Bearscroft, Bull. N. P. 115. The same principle is fully established in this country.. 2 Kent, Comm. 92, 93; Story, Confl. Laws, 115, 116; Medway v. Needham, 16 Mass. 157; Inhabitants of West Cambridge v. Inhabitants of Lexington, 1 Pick. 506; Putnam v. Putnam, 8 Pick. 433. And though the considerations on which such marriages have been held valid in the domestic forum of the parties, where there has been a studied evasion of the law of their domicil, is the hardship and the mischief which would arise to society by bastardizing the issue of such marriages, yet it is not the less a distinct recognition of the principle that the legal capacity of a person to do an act depends on the law of the place where the act is done. Huber (De Conflictu Legum, 1–8) denies that the magistrate in the forum of the domicil is bound by the jus gentium to admit the validity of such marriages in direct evasion of the law of the parties' own country, yet no doubt can be entertained that they would be held valid in every other forum. And in a case where two British subjects, being minors, were in France for the purpose of education, and intermarried there, it was held that the validity of the marriage, and of course the capacity of the parties to enter into the contract, was to be determined by the law of France, and not by that of England, although the English domicil remained unchanged, and the marriage being a nullity by the law of France, was held to be void in England. Confl. Laws, 77; 2 Hagg. Consist. 407, 408. It has been decided in Massachusetts, after the most deliberate consideration, that a person who has been convicted of an infamous crime which rendered him incapable of being received as a witness in the country where the conviction took place, is a competent witness when in another jurisdiction. Com. v. Green, 17 Mass. 515. This is another application of the general principle that the personal status of an individual is to be determined by the law of the place where he is, as to acts done within that jurisdiction, and that the civil incapacities which attach to him in one country do not follow him into another. By the law of France a man does not attain to the age of legal majority until the age of twenty-five. If a Frenchman entered into a contract in this state, where the age of major-ity is twenty-one, between the ages of twenty-one and twenty-five would he be allowed to avoid it on the plea of minority? The supreme court of Louisiana has said that in such a case the contract would be binding, and that the capacity of the person would depend on the law of the place where the contract was made, and not on that of the person's domicil. Confl. Laws, 73; Saul v. His Creditors, 7 Mart. [N. S.] 596. And though that court does not appear to have a settled opinion on the general question how far the personal status of an individual, as it is fixed by the law of his domicil, may be changed by the law of the place where the act is done, it is apprehended that the opinion here expressed would be followed in this state.

But the clearest and most distinct recognition of the principle that the civil capacities and incapacities of an individual are to be determined by the law of the place where the person is, and not by that of his domicil, is found in the decisions upon the very subject which is involved in this case—that of slavery. It was decided in 1772, in Sommersett's Case, that a slave who was carried by his master to England, from any of the colonies, became free as soon as he stepped on English ground. 1 Black. 425, note; Loftt, 1; 11 State Tr. 340. A similar decision, some years after, was made in Scotland. 2 Hagg. Adm. 118. It is supposed, indeed, that a different rule prevailed before that decision. It is said that the traffic in slaves had for a long series of years been as public and notorious in London as in the colonies, and that the legality of it had been sustained by the most eminent lawyers in the kingdom. The Slave Grace, 2 Hagg. Adm. 105–114.. However that may be, the law as it was then. declared, has never since been brought into doubt; and whether the real grounds of the decision are to be found, as intimated by Lord Stowell, in the "increased refinement of the sentiments and manners of the age," or in the maxims of the ancient common law relating to villanage (2 Hagg. Adm. 109), it seems to me that it may be well vindicated upon those principles of the jus gentium. which have already been frequently mentioned, and which are indicated by Lord Stowell in another part of the same opinion. "The entire change of the legal character of individuals, produced by a change of local situation, is far from being a novelty in the law. A residence in a new country introduces a change of legal condition, which imposes rights and obligations totally inconsistent with the former rights and obligations of the same persons. Persons bound by particular contracts which restrain their liberty, debtors, apprentices, and others, lose their character and condition for the time, when they reside in another country, and are entitled as persons totally free, though they return to their original servitude and obligations upon coming back to the country they

had quitted." 2 Hagg. Adm. 113. But if the decision in Sommersett's Case did not entirely approve itself to the judgment of that eminent magistrate, we may set against his doubts the opinion of another learned judge, although he also may be thought to trace the decision to the improved moral perceptions of the age, and the more full development of the principles of natural equity and universal justice, than to any ancient maxims of the common law, considered as a mere municipal code. "It is matter of pride to me," says Mr. Justice Best, "to recollect that while economists and politicians were recommending to the legislature the protection of this traffic, and senators were framing statutes for its promotion, and declaring it a benefit to the country, the judges of the land, above the age in which they lived, standing on the high ground of natural right, and disdaining the lower doctrine of expediency, declared that slavery was inconsistent with the genius of the English constitution, and that human beings could not be the subject-matter of property. As a lawyer, I speak of that early determination, when a different doctrine was prevailing in the senate, with a considerable degree of professional pride." Forbes v. Cochrane, 2 Barn. & C. 448. But to whatever cause is to be ascribed this change of the common law of England, if change it was, it has since that time been considered the settled law, that a slave on being introduced into England becomes free. And the law as it was then declared by Lord Mansfield, is believed to be generally adopted by the non-slaveholding states, in this country. Confl. Laws, 92; Case of Francisco, 9 Am. Jur. 490. The question was very fully considered by the supreme court of Massachusetts, in the recent Case of the Slave Med (Com. v. Aves, 18 Pick. 193; Aug., 1836), and it was decided, that a slave on coming into that state became free, except in a case falling within the provisions of the constitution of the United States, and the act of congress of Feb. 12, 1793, by which provision is made for delivering up persons who are held to labor or service in one of the United States on their escaping into another. If the owner voluntarily brings his slave into the state, the case does not come within the provisions of the law, and he becomes free. The same doctrine was held by Mr. Justice Washington in the case of Butler v. Hooper [Case No. 2,241], and again in Ex parte Simmons [Id. 12,863]. And it appears from the cases of Lunsford v. Coquillon, 2 Mart. [N. S.] 404, and Rankin v. Lydia, 2 A. K. Marsh. 470, that the principle has been fully recognized in Louisiana and Kentucky, that the relation of master and slave is founded exclusively on municipal law for which the courts in those states do not claim any extra-territorial force.

All these cases stand upon the principle that slavery, and with it as a necessary consequence, all the civil incapacities which are peculiar to that servile state, depend entirely on the local law. It follows of course that when a slave passes into a country, by whose laws slavery is not recognized, his civil condition is changed from a state of servitude, to that of freedom, and he becomes invested with those civil capacities which the law of the place imparts to all who stand in the same category. It is, indeed, said by Chief Justice Shaw, in delivering the opinion of the court, in the Case of the Slave Med, that "slaves in such case become free, not so much because any alteration is made in their status or condition, as because there is no law which will warrant, but there are laws, if they choose to avail themselves of them, which prohibit their forcible detention, or forcible removal." If by this is meant there is no change in the personal state of a slave in relation to the law of the country he has left, it may well be admitted to be correct. The law of that country, notwithstanding he is for the time withdrawn from its direct and immediate control, would hold him to be a slave until he acquired his freedom in some of the forms of emancipation known to that law. His mere transit into a country whose law declared him free, within its jurisdictional limits would not per se liberate him from the incapacities and obligations resulting from the law of his domicil within the legitimate sphere of that law's operation, and if he were to return to that country the condition of servitude would reattach to him precisely as when he left it. So it was decided by Lord Stowell, in the Case of the Slave Grace, and the same principle is distinctly established by the case of Williams v. Brown, 3 Bos. & P. 69. But it by no means follows that because the law of his domicil holds him to be a slave, he has not, while within a jurisdiction which declares him to be free, all the faculties which belong to a state of freedom. It is difficult to understand what the law does, by declaring him free, if it does not invest him with the rights and capacities of a free man; and if it does, it confers upon him a personal state very different from that of slavery; and there is no absurdity or contradiction in supposing a man to be a free man in one country and a slave in another. Both result from the same principle, the absolute supremacy of the laws of every state within its own territorial limits. And though Lord Stowell rather sarcastically remarks, that the law of England, by adopting this principle, puts the liberty of a man, as it were, into a parenthesis, it is nothing different from what occurs in many other cases, in which an individual is affected by the law of his domicil with peculiar capacities and disqualifications, which are recognized either in his favor or against him while resident within another jurisdiction. When he returns to his own country he becomes reinvested with his original personal status, and the capacities and disqualifications of the law of his domicil attach. Take

a case of familiar and daily occurrence. A man is a magistrate in the place of his domicil. He passes out of that jurisdiction, and he can exercise no authority as a magistrate. He becomes a private person, but on his return to the place of his domicil he reassumes his personal status as a magistrate. The law which declares a slave free on his introduction into this country, by necessary consequences, if it be not an identical proposition, declares him to be possessed of the civil qualities of a freeman, and confers on him the faculty of vindicating his rights, and claiming redress for wrongs in the ordinary course of justice; and this general proposition is an answer to another part of the argument, that the libellant in this case, was put under the government of the respondent who stood loco domini, the owner having delegated to him his authority. That authority when the slave was within the jurisdiction of this country, could be exercised only under the restrictions of our law. Years before the decision of Sommersett's Case, it was said by Lord Chancellor Northington, that a negro might maintain an action in England, against his master for ill usage. Shanley v. Harvey, 2 Eden, 126, quoted, 2 Hagg. Adm. 116.

It was supposed in the argument that a distinction might be made, founded on the circumstance that the tort was committed on the high seas, which are within the common jurisdiction of all nations. It is true that no nation can claim an exclusive jurisdiction over any part of the high seas, but all nations can, and do claim an exclusive jurisdiction over their own vessels that float on the high seas. A foreigner who is a passenger on board an American vessel, when the vessel has left the port, and is beyond the jurisdiction of his own country, is amenable to the laws of this country and is under their protection. If he commits a crime he may be indicted in our courts, and punished by our laws. If he commits a tort, he is personally liable to answer for it in our courts, and if he suffers a wrong he may appeal to the laws of this country for redress, as much as though the wrong had been done him on land. If the libellant would not be precluded from maintaining an action for a tort done on land, he may equally maintain one for a tort done in an American vessel on the high seas. Forbes v. Cochrane, 2 Barn. & C. 448.

It was supposed at the argument that the capacity of the libellant to maintain this action in the courts of the United States may stand on grounds somewhat different from what it would in the state courts; that slavery existing in some of the individual states, and not being prohibited by the constitution and laws of the United States, the national courts might be bound by the principles of the jus gentium to recognize the incapacities of slaves having a foreign domicil, even where it would not be done by the state courts, and that the national tribunals are under the same obligations in this respect, whether sitting in a state where slavery is admitted, or where it is prohibited. If this were conceded, and in the view which I take of the case I do not think it necessary to give an opinion upon the question, the answer is, that a court sitting in Louisiana is no more bound, than one sitting in Maine, to recognize as to any acts, or rights acquired, within the exclusive jurisdiction of the United States, the artificial incapacities of persons resulting from a foreign law. The question in both cases, would be, whether the party could by the laws of the United States, have a standing in court. The court certainly is not bound to enforce against him, a personal incapacity derived from the law of his domicil, because that law can have no force in this country any further than our law on the principles of comity chooses to adopt it; and every nation will judge for itself how far it is consistent with its own interest and policy to extend its comity in this respect. If the legislative power has prescribed no rule, the courts must of necessity decide in each individual case as it is presented, and however embarrassing and perplexing the case may sometimes be, the courts cannot escape them. If the incapacity alleged were slavery, it is not for me to say what would be the judgment of a court sitting within a jurisdiction where slavery is allowed, but sitting as this court does, in a place where slavery by the local law is prohibited, I do not feel myself called upon to allow that disqualification when it is alleged by a wrongdoer, as attaching to the libellant by the laws of a foreign power, for the purpose of withdrawing himself from responsibility for his own wrong.