Rocky CAMPBELL, et al., Appellant
(Plaintiff Below),

v.

CRITERION GROUP, et al., Appellee
(Defendant Below).

No. 29S02–9212–CV–1034.

Supreme Court of Indiana.

Dec. 30, 1992.

Alan K. Mills, Lester H. Cohen, Indianapolis, for appellant.

Dean T. Barnhard, Indianapolis, for appellee.

Legal Services Organization of Indiana, Inc., Norman P. Metzger, Kenneth J. Falk, John Jay Boyce, Indianapolis, amici curiae.

City–County Legal Division, Mary Ann G. Oldham, Andrew P. Wirick, Indianapolis, amici curiae.

SHEPARD, Chief Justice.

We accept transfer in this case to consider important questions about the authority

of Indiana courts to permit pauper appeals in civil cases and the method by which such appeals may be brought.

### Procedural History and Facts

A number of named and unnamed plaintiffs instituted an action for damages against Criterion Construction, Criterion Group and El Dee Apartments. The original complaint alleged that plaintiffs' personal property had suffered damage by reason of negligence and conversion on the part of some or all of the defendants. A complex of motions, hearings and orders ensued in the Hamilton Circuit Court, the net effect of which continues to be a matter of contention between the parties in a separate appeal.

It suffices to observe that the trial court's orders effected the dismissal of some parties and summary judgment as to others and that among the parties so affected were plaintiff-appellants Rocky Campbell, Jesse Parker, Carolyn Willis, and Marilyn Johnson (collectively, "Campbell"). Campbell, proceeding *pro se*, timely filed a Praecipe for Record on Appeal along with a Verified Motion to Proceed on Appeal as a Poor Person ("Verified Motion"). The Verified Motion included statements about his indigency and a prayer for relief from all appellate "fees, security, or other costs."

Certain defendants filed an objection to the Verified Motion. Thereafter, the trial court denied the Motion without opinion. Campbell petitioned the Court of Appeals for review of the trial court's denial of his Verified Motion and asked for an order directing that the record of proceedings, including the transcript of evidence, be prepared at public expense. The Court of Appeals granted appellant's petition to proceed on appeal *in forma pauperis* and also held that an indigent civil appellant is entitled to a record of proceedings prepared without cost to the indigent. *Campbell v.*

*Criterion Group* (1992), Ind.App., 588 N.E.2d 511.

The Criterion Group's petition for transfer assigns six errors. We consolidate these into two questions: (1) Was Campbell's Verified Motion to Proceed on Appeal as a Poor Person properly denied by the trial court? and, (2) If allowed to proceed *in forma pauperis*, is Campbell entitled to have the record of proceeding, or a portion thereof, prepared at public expense?

### I. Denial of Campbell's Motion to Proceed as a Poor Person

Criterion Group and its co-defendants argue that there exists in Indiana no legal authority vesting in our courts the power to permit the appeal of a civil action *in forma pauperis*. Campbell disputes this assertion but cites no decision of this Court, statute or rule of procedure which expressly rebuts it. The decision of the Court of Appeals in this case contains an excellent history of the right to appeal and Indiana's accommodation of indigents. 588 N.E.2d at 513–516. We incorporate that history herein. Ind. Appellate Rule 11(B)(3). Because of the importance of the question to indigent litigants and, consequently, to the bench and bar, we treat the issue more fully here.

Our analysis will proceed along three lines: applicable statutes; the common law power of courts; and constitutional and procedural authority.

### A. *Is There Statutory Authority for Pauper Appeals?*

Campbell posits that Ind.Code Ann. § 34-1-1-3 (West 1983) provides authority for civil appeals *in forma pauperis*.[1] This section of our code has its origin in a 1495 act of the British Parliament which provided, in part, that every poor person with a cause of action might seek a writ, writs original and writs of subpoena, according to the nature of their cause, "paying nothing ... for the seal ..., nor to any other

---

1. Campbell asserts that this section also applies to criminal proceedings, but this Court has usually regarded this statute as applying only to civil appeals. *See, e.g., State ex rel. Morris v. Wallace* (1872), 41 Ind. 445. The Criminal Code contains a comprehensive scheme providing for indigent criminal defendants. *See* Ind.Code Ann. §§ 35-33-7-5 to 7-6 (West 1986) (assignment of counsel); §§ 35-38-1-18 (West Supp. 1992) & 35-38-3-2(b)(3) (West 1986) (fines and costs). *See also* Ind.Code Ann. § 33-1-4-1 (West Supp.1992) (transcript); 33-9-10-1 *et seq.* (West 1986 & Supp.1992) (legal counsel); 33-19-2-3 (West Supp.1992) (costs).

person for the writing of the same writ or writs." 11 Henry 7, ch. 12. The statute also directed courts to "appoint all other officers requisite and necessary to be had for the speed of the said suit ... which shall do their duties without any reward." *Id.* This provision was copied early on by pioneer Hoosier legislators eager to establish for our state a respected and humane system of justice.[2] Their intention in adopting this statute, they wrote, was to ensure "that impartial justice shall be administered to all citizens as well to the poor as to the rich."[3] Though this early language was occasionally amended, its thrust remained intact until the 1852 recodification and revision of the civil code. 2 Ind. Rev.Stat. 1852, Part II, ch. 1, art. 2 § XV (p. 30). Thereafter, suits *in forma pauperis* suits were regulated by section XV of the reorganized civil code, which provided:

> [A]ny poor person, not having sufficient means to prosecute or defend an action, may apply to the court in which the action is intended to be brought, or is pending, for leave to prosecute or defend, as a poor person. The court if satisfied that such person has not sufficient means to prosecute or defend the action, shall admit the applicant to prosecute or defend as a poor person, and shall assign him an attorney to defend or prosecute the cause, and all other officers requisite for the prosecution or defence [sic], who shall do their duty therein without taking any fee or reward therefor from such poor person.

This language is now substantially embodied in section 34–1–1–3. Whether the original British statute, or its many American successors, authorized appeals *in forma*

*pauperis* has been a matter of much dispute.[4] The crux of the debate is whether an error upon which a writ would lie is an "action" as contemplated by the statute. A number of prominent commentators, including Lord Coke, urged upon courts a distinction between writs and actions. And, as nice as it is, it was on this distinction that the federal *in forma pauperis* statute, which expressly permitted the plaintiff to "prosecute to conclusion" his action, was found not to contemplate pauper appeals. What is meant by "conclusion," the U.S. Supreme Court said, "is the termination of the suit or action in the court where it is commenced." *Bradford v. Southern Ry.*, 195 U.S. 243, 248, 25 S.Ct. 55, 57, 49 L.Ed. 178 (1904).[5]

In arriving at its decision, the Supreme Court cited approvingly the opinion in *Bristol v. United States*, 129 F. 87, 88 (7th Cir.1904), where the Seventh Circuit said: "Surely an erroneous ruling by the trial court cannot be held to furnish a 'cause of action,' as that phrase is commonly understood." Likewise, the Supreme Court of New York, commenting on a statute similar to ours, earlier opined that "no book holds the ... words *cause of action* to be identical with a writ of error or cause of a writ of error." *Moore v. Cooley & Blackman*, 2 Hill 412, 413 (N.Y.Sup.Ct.1842).

Nonetheless, some states with statutes like ours did allow civil pauper appeals early on. In *Philips v. Rudle & Carmicheal*, 1 Yerger 121 (Tenn.1826), a Tennessee court rejected the contention that their pauper statute (which the court characterized as co-extensive with 11 Henry 7, ch.

---

**2.** Although the Indiana statute generally paralleled its British antecedent, note that Indiana borrowed from equity the practice of permitting defendants, as well as plaintiffs, to proceed as paupers. Edmund Daniell, Pleading and Practice of the High Court of Chancery 35 (3rd Amer. ed. 1865); George A. Bicknell, Indiana Civil Practice 501 (1864).

**3.** *Reprinted in* 20 Indiana Historical Collections, Laws of Indiana Territory, 1809–1816, at 303–305 (Louis B. Ewbank & Dorothy L. Riker eds., 1934). The preface to the original British statute set out that "the king, our sovereign lord, of his most gracious disposition, willeth and intendeth indifferent justice to be held and minis-

tered according to his common laws to all his true subjects, as well to the poor as rich." 11 Henry 7, ch. 12.

**4.** For a review of this debate as it unfolded in British courts, see generally *Drennan v. Andrew* (1866) L.R.–Ch. 300, 301–02 n. 7.

**5.** Six years after the *Bradford* ruling, Congress amended the federal *in forma pauperis* statute to provide expressly for appeals. 36 Stat 866, ch. 435 (1909–11) (now codified as amended at 28 U.S.C. § 1915 (1988)); *Kinney v. Plymouth Rock Squab Co.*, 236 U.S. 43, 35 S.Ct. 236, 59 L.Ed. 457 (1915).

12) applied only to plaintiffs suing out writs at the commencement of a suit. Instead, the court said, the act extended to the suing out of writs of error, or obtaining appeals in the nature of writs of error. *See also Wilson v. Melcroft Coal Co.*, 226 Ky. 744, 11 S.W.2d 932 (1928). These opinions appear to be based on what might loosely be termed public policy grounds.

For our part, we observe that at its inception, the statute 11 Henry 7, ch. 12 had application only in the common law courts, Daniell, *ante* at 35, where a system of writs formed the sole method of review. 2 Pollock and Maitland, History of English Law 664–66 (1968 Reissue) (2d ed.). This system had its origin in the writ of false judgment by which a disappointed litigant could accuse a judge of rendering a corrupt judgment. *Id.* at 666.[6] A debate would then occur in king's court, not between the litigants but between the complainant and the trial court. *Id.* at 667.

Originally, judges of the king's courts could not themselves be accused of false judgment. *Id.* at 668. Seeking to bridge this gap, early common law lawyers formulated what came to be known as the writ of error. The key to the writ was its fiction that one might complain against a judgment without directly accusing the royal judge who had rendered it. *Id.* The object of the proceeding was not the issue between the parties, rather it constituted a trial of the final judgment at law which had been rendered by the court below. 4 C.J.S. *Appeal and Error* § 12 (1957). Consequently, the suing out of a writ of error was generally held to signal the commencement of a new suit, albeit one which did not constitute an action. *Id.* at § 11(c).

In Indiana, the legislature has substituted the appeal for the writ of error. *Pittsburgh, C.C. & St.L. R.R. v. Hoffman* (1928), 200 Ind. 178, 162 N.E. 403. The appeal was unknown to common law courts, *City of Indianapolis v. Hawkins* (1913), 180 Ind. 382, 103 N.E. 10, but is of Roman origin and was introduced to our jurisprudence through the civil law-based equity, ecclesiastical and admiralty courts. Edson R. Sunderland, *Problems of Appellate Procedure*, 3 Notre Dame Law. 50, 50 (1927); 4 C.J.S. *Appeal and Error* § 18a (1957). An appeal is not the commencement of a new suit, like a writ of error, but is a step in the original cause. *Id.* at § 20b.[7] This helps explain why the equity, ecclesiastical and admiralty courts considered the prosecution of a suit *in forma pauperis* to include the taking of an appeal [8] even while common law courts debated whether 11 Henry 7, ch. 12 permitted

---

**6.** The logic here ran somewhat along the lines that the judgment constituted an actionable libel of the litigant.

**7.** *See also* L.L. Bomberger, *Comments on the Report of the Committee on Jurisprudence and Law Reform*, 17 Ind.L.J. 417, 418 (1942) ("[n]o modern authority treats an appeal as a separate law suit. It is nothing more or less than an additional step in the original case.

....

Roscoe Pound, in his very late work entitled 'Appellate Procedure in Civil Cases,' states the whole case in this language: 'A case goes up on appeal and the parties go with it.'"

**8.** The Anglo–American appellate system has its origin in the graduated hierarchy of the ecclesiastical courts. Pollock and Maitland, *ante* at 664. Maguire argues that these courts had worked out an *in forma pauperis* procedure not later than the end of the thirteenth century, John MacArthur Maguire, *Poverty and Civil Litigation*, 36 Harv.L.Rev. 361, 365 (1923), and it was established in ecclesiastical procedure that a person might take their appeal *in forma pau-*

*peris.* 2 Phillimore, The Ecclesiastical Law 957 (2nd ed. 1895); *Grindall v. Grindall,* 4 Hagg. Ecc.Rpts. 5 (1831).

The ecclesiastical appellate model was adopted for use in the emerging equity courts. Accordingly, in *Drennan v. Andrew,* (1866) L.R.–Ch. 300 (1866), the court observed that, although there was some conflict among the precedents, where a common order to sue *in forma pauperis* had been obtained at any time during the suit, such order was sufficient to carry the pauper through all the stages of the suit including an appeal. *See also Ferguson v. Dent,* 15 Fed.Rep. 771, 773–4 (W.D.Tenn.1883) (Equity, unlike common law, observes the more liberal *in forma pauperis* procedures of the civil law.). A similar parallel can be drawn with American admiralty practice where, prior to being superseded by federal statute, the suit *in forma pauperis* was governed by "more liberal" civil law rules. *See Roy v. Louisville N.O. & T.R. Co.,* 34 F. 276, 277 (W.D.Tenn.1888); *Polydore v. Prince,* 19 F.Cas. 950, 950 (D.Me.1837) (No. 11,257).

the suing out of a writ of error *in forma pauperis.*

■ Today, of course, we need not decide whether Ind.Code § 34-1-1-3 extends to writs of error. Instead, we begin by acknowledging that our contemporary judicial system springs from a fusion of law and equity. Our legislators elected to cap this hybrid process with equity's appeal and not the common law's writ of error and that was within their prerogative. *Pittsburgh, C.C. & St.L. R.R.,* 200 Ind. at 194, 162 N.E. 403. As a result, today in all cases, whether legal or equitable by nature, an appeal constitutes nothing more than the continued prosecution of the original action. *A fortiori,* a statute which permits a court to admit an indigent to prosecute or defend an action conveys the power to permit an appellant to appeal *in forma pauperis.*

We are fortified in this belief by the words we delivered some 130 years ago in *Falkenburgh v. Jones* (1854), 5 Ind. 296, another case in which we were called upon to explicate § 34-1-1-3. There, we said

in arriving at our conclusions, we have felt constrained to give a liberal construction to our statutes in favor of the pauper, for we can scarcely conceive of a system of law so inhuman and cruel that would consign the destitute and friendless to conviction and infamy, without affording full and ample means for investigation.... [T]hat part of our constitution, which provides that "justice shall be administered freely, and without purchase, completely and without denial," would be an empty boast, and worse than mockery to the poor.

*Id.* at 299.

### B. Do Indiana Courts Have Common Law Authority for Pauper Appeals?

Indiana Code Ann. § 1-1-2-1 (West 1981) stipulates that, with some exceptions not relevant here, "[t]he common law of England, and statutes of the British Parliament made in aid thereof" shall be among the bodies of law which govern our state. *See generally Ketelsen v. Stilz* (1915) 184 Ind. 702, 704-09, 111 N.E. 423, 424-25. As a result, within permissible bounds, those powers wielded by common law judges are now vested in Indiana courts. Correspondingly, then, our ability to accommodate indigent litigants is also in part a function of the authority afforded common law judges similarly confronted with destitute suitors.

In *Falkenburgh v. Jones,* 5 Ind. at 297, we located pauper suits within the common law tradition, characterizing Indiana's *in forma pauperis* statute as being merely declaratory of an otherwise existing, traditional court power. *Simplex dicta* in other cases, however, describes the authority to grant dispensations to poor suitors as a creature of statute, first introduced with the adoption in 1495 of 11 Henry 7, c. 12, and theretofore unavailable to common law judges. *Hoey v. McCarthy* (1890), 124 Ind. 464, 24 N.E. 1038; *see also Harrison v. Stanton* (1896), 146 Ind. 366, 45 N.E. 582. A review of the authorities dictates this conflict be resolved in favor of *Falkenburgh.* Pollock and Maitland state that it was accepted practice as early as the reign of Henry III (1216-1273) to excuse the poor from the costs of writs. Pollock and Maitland, *ante* at 195. Case law predating the statute 11 Henry 7, c. 12 bears this out, *see, e.g.,* Y.B. 15 Edw. 4, fol. 26b (1476), and in *Brunt v. Wardle,* 133 Eng.Rep. 1254, 1257 (1841), Chief Judge Tindal remarked "[a]fter all, is St. 11 H. 7, c. 12 any thing more than confirmatory of the common law?"[9]

In reflecting on this same question, the Supreme Court of California has stated that

the power of the English common-law courts to remit fees on petition in forma

**9.** *See also* 7 Encyclopedia of the Laws of England 192 ("This common law right [to sue *in forma pauperis* ] was affirmed by 11 Statute Henry 7, c. xii."); *Ferguson v. Dent,* 15 F. at 773; Maguire, *supra,* at 365-66, and cases cited therein ("Judges and commentators intimate that un-

til the statutes requiring award of costs, common law courts had inherent power to entertain gratuitously the plaints of the needy."); Note, *Proceedings In Forma Pauperis,* 31 Harv.L.Rev. 485, 485 (1917).

pauperis did not have its origin in any statute, but was in fact exercised as one of the inherent powers of the courts themselves quite independently of statute.... Imperfect as was the ancient common-law system, ... it would strike one with surprise to be credibly informed that the common law courts of England shut their doors upon all poor suitors who could not pay fees, until Parliament came to their relief.

*Martin v. Superior Court,* 176 Cal. 289, 168 P. 135, 137 (1917). We believe this to be an accurate statement of the common law as it exists in Indiana, *Hoey* and *Harrison* notwithstanding.[10]

■ The gravamen of the case at bar, of course, is whether one may proceed on appeal *in forma pauperis.* As was observed above, our legislature engrafted review by appeal upon our common law scheme. Effectuating this mandate requires that we manage Indiana's common law, not as a frozen mold of ancient ideas, but as a dynamic force which keeps pace with progress. *Brooks v. Robinson* (1972), 259 Ind. 16, 284 N.E.2d 794. Moreover, the supplementation of the law with novel statutory arrangements or provisions does not necessarily preempt the common law system along side of which those provisions must operate. *Picadilly v. Colvin* (1988), Ind., 519 N.E.2d 1217. Finally, the traditions of equity have force in Indiana under Ind.Code Ann. § 1-1-2-1 just as do those of the common law proper. *Union Trust Co. v. Curtis* (1914), 182 Ind. 61, 105 N.E. 562.

■ As such, we believe the legislative conjoining of our common law *nisi prius* scheme with an appeals process worked a corresponding fusion of the common law power to allow *in forma pauperis* suits and the equitable tradition of pauper appeals. Correspondingly, the appeal *in for-*

*ma pauperis* has now become rooted in the common law of our state. A number of our sister courts have reached similar conclusions. *See, e.g., Silvestro v. Almonte,* 484 A.2d 900 (R.I.1984) (court has inherent power to waive costs of appeal by indigent defendant in any civil action); *Melder v. Carreiro,* 541 A.2d 1293 (Me.1988) (same); *O'Connor v. Matzdorff,* 76 Wash.2d 589, 458 P.2d 154 (1969) (same).

■ This holding is not necessarily conclusive as to the question before us, however, for only that common law which is not repugnant to our Constitution and statutes has force in Indiana. Therefore, we must examine pertinent statutes to determine whether they disclose a legislative intent to deprive the appellate courts of the power to admit indigents *in forma pauperis.* Only the plainest declaration of legislative intent will be construed as an effort to deprive the courts of their common law authority. *Grusin v. Stutz Motor Car Co.* (1933), 206 Ind. 296, 187 N.E. 382.

■ We find no such express intent. The statute dealing with the payment of fees, Ind.Code Ann. § 33-15-5-2 (West Supp.1991), directs the clerk of the Supreme Court to "tax and charge a fee of two hundred fifty dollars ($250) in each cause filed in either the supreme court or the court of appeals." *See also* Ind.Code Ann. 33-15-5-1 (West 1983) (accounting of fees).[11] These statutes are general in nature and have to do with the orderly collection and disposition of fees. None of them pertains to the subject of the payment of filing fees by paupers, and none expressly denies to the appellate courts the power to waive those fees. Therefore, we believe the appeal *in forma pauperis* to be both congenial to our common law tradition and unpreempted by current statutory enactment.

---

10. By statute, Indiana courts are not limited to referring solely to the common law unmodified by statute (*lex non scripta*) but instead are also authorized to consult those acts of the British Parliament "made in aid thereof" prior to 1607. Ind.Code Ann. § 1-1-2-1. Having found that the suit *in forma pauperis* was known to the common law, it follows that 11 Henry 7, c. 12 is

a statute made "in aid thereof" as contemplated by the statute. *Id.*

11. The filing fee prescribed by § 33-15-5-3 appears to be the only fee imposed by the state upon those prosecuting an appeal. All other charges were repealed by Pub.L. No. 286-1989, 1989 Ind.Acts 1995.

### C. Is There Constitutional Authority for Pauper Appeals?

The Indiana Constitution, Article VII, § 4 provides that "[t]he Supreme Court shall exercise appellate jurisdiction under such terms and conditions as specified by rules." The Court of Appeals exercises its jurisdiction "under such terms and conditions as the Supreme Court shall specify." *Id.* at § 6. The Judicial Study Commission's commentary accompanying the foregoing provisions states that appellate power should be governed by the "flexible mechanism" of rules so that its exercise may be adjusted to accord with the demands of the times. Judicial Study Commission, *Article VII of the Constitution of Indiana, reprinted in* REPORT OF THE JUDICIAL STUDY COMMISSION, at 5 (1970) [hereinafter JUDICIAL STUDY COMM'N REPORT].[12] The Legislature has acknowledged this prerogative. Ind. Code Ann. §§ 34-5-1-2 to -2-1 (West 1983 & Supp.1992) and 33-2-1-3 (West 1983).

■ In exercising rule-making authority, our lodestar is the duty to ensure the orderly and expeditious conduct of court business as well as to secure the rights of the parties. *Smith v. State ex rel. Hamill* (1894), 137 Ind. 198, 36 N.E. 708. This imperative of regular and equal justice is undercut when meaningful access to general, procedural entitlements is conditioned upon a party's financial means. The people of Indiana legitimately expect more, and this Court has repeatedly acted to avoid such results.

■ In *Webb v. Baird* (1854), 6 Ind. 13, for example, we affirmed an order directing a county to meet the expense of an indigent defendant's representation despite the absence of particularly specific statutory authority. *Id.* at 20. We observed that our courts must of necessity have the power to make those orders needed to "accomplish the ends of public justice." *See id.* Faced again with this question in *Gordon v. Board of Comm'rs* (1876), 52 Ind. 322, we affirmed that the power to accommodate the indigent is "inherent in the court, to be exercised whenever the administration of justice judicially requires it to be done." *See also Thompson v. Thompson* (1972), 259 Ind. 266, 277, 286 N.E.2d 657, 663 (The Court "necessarily" has the authority to make *in forma pauperis* "exemption meaningful and to require that ... costs be paid from public funds when necessary to permit an indigent person access to our courts and the legal remedy they afford."); *Hoey v. McCarthy*, 124 Ind. at 466, 24 N.E. 1038 ("It is manifestly the duty of the courts to see to it that justice is not allowed to fail....").[13]

We think it clear that, taken together, these cases stand for the proposition that this Court possesses the authority to ensure indigent suitors access to that process to which they would otherwise be due. It remains to be asked whether an appeal is part of the process to which Campbell was due. Indiana Code Ann. 34-1-47-1(a) (West Supp.1992) provides: "Appeals may be taken from the circuit courts ... from

---

12. Our law regarding which sources provide permissible indicia of the meaning of our constitution's provision is somewhat unsettled. *See, e.g., Whitcomb v. Young* (1972), 258 Ind. 127, 279 N.E.2d 566 (probative value of various common sources doubted). That question, however, is not implicated here, for the judicial article adopted in 1970 specified that "[t]he report of the Judicial Study Commission and the comments to the article contained therein may be consulted by the Court of Justice to determine the underlying reasons, purposes and policies of this article and may be used as a guide in its construction and application." 1969 Ind.Acts ch. 457 at schedule, 1969 Ind.Acts 1853. Nor do we think the repeal of this language in 1984 affects this fact. Pub.L. No. 383-1983, 1983 Ind.Acts 2213.

13. In *Square D. Co. v. O'Neal* (1947), 225 Ind. 49, 72 N.E.2d 654, we were asked to find that our rules superseded a statute requiring appellants to pay a $50 deposit which would later be paid over to the successful party to defray the costs of the appeal. 225 Ind. at 51, 72 N.E.2d at 655. We rejected the request, holding that "the requirement of the deposit of money ... is neither a matter of practice nor procedure but is a part of our substantive law." 225 Ind. at 52, 72 N.E.2d at 655. Without reviewing our holding there, we would note the distinction between excusing indigents from payment of fees and costs which are essentially state interests and excusing them from posting bond or paying a deposit—provisions designed to protect successful litigants. *Greer v. Dillard*, 213 Va. 477, 193 S.E.2d 668, 670-71 (1973).

all final judgments." The right to an appeal is also mentioned in Article VII, § 6 of the Indiana Constitution.[14] These measures disclose that Hoosiers consider the right to an appeal one of the tools indispensable to meaningful participation in the judicial process.[15]

A ruling that this right is divested by the inability to pay a few dollars in courts costs would fall far short of what is expected in a state which has "[f]rom the date of its admission to the Union ... been a leader in providing indigent persons with ... fair treatment while in court." *Thompson*, 259 Ind. at 273, 286 N.E.2d at 661. Therefore, we find an appeal in this case to be an integral part of our process and thus one which we have the authority to guarantee Campbell through the exercise of our constitutional power.[16]

### D. Procedural Default

■ Criterion Group next argues that even if the *in forma pauperis* appeal is permissible, the trial court's denial of Campbell's petition should nonetheless be upheld because Campbell lost by procedural default his right to proceed in that status. This argument relies on the proposition that plaintiff's Verified Motion was governed by, yet not in compliance with, Ind.Code Ann. § 33–19–3–2 (West Supp. 1992). Section 33–19–3–2 provides:

A person entitled to bring a civil action ... may do so without paying the required fees or other court costs upon filing in court, under oath and in writing, a statement:

(1) declaring that the person is unable to make the payments or to give security for them because of the person's indigency;

(2) declaring that the person believes that the person is entitled to the redress sought in the action; and

(3) setting forth briefly the nature of the action.

Petitioner's argument is without merit. Section 33–19–1–1 (West Supp.1992) makes plain that the provisions of Article 19 govern only those proceedings conducted in circuit, superior, county, probate, municipal and city and town courts. That this is the case is reinforced by a review of the original language of § 33–19–3–2 which, as adopted in 1949, read "[a]ny person entitled to institute any civil action or proceeding in the circuit, superior or probate courts, may, upon order of the court, commence any such action or proceeding without being required to make the payment provided for". Act of Mar. 7, 1949, ch. 128, § 2, 1949 Ind.Acts 338. In view of these facts, it is clear to us that Ind.Code § 33–19–3–2 applies solely to the waiver of fees and costs assessed attendant to the resolution of matters within *nisi prius* courts and has no application to the litigant preparing to prosecute or defend an appeal.

■ Moreover, we hold that litigants seeking to proceed on appeal *in forma pauperis* need only convince the court of their indigency in order to have their appli-

14. Article VII, § 6 provides in pertinent part that the Court of Appeals "shall exercise appellate jurisdiction under such terms and conditions as the Supreme Court shall specify by rules which shall, however, provide in all cases an absolute right to one appeal." Although we first had occasion to take note of this clause in *Soft Water Utilities v. LeFevre* (1973), 261 Ind. 260, 269, 301 N.E.2d 745, 750, we have yet to confront it squarely. The Judicial Study Commission commentary indicates that the "one appeal" provision was to ensure that the rules allocating appellate jurisdiction would not "infringe the *traditional* right to one appeal." JUDICIAL STUDY COMM'N REPORT, at 7 (emphasis added). *But see Campbell v. Criterion Group* (1992), Ind.App., 588 N.E.2d 511, 515 n. 6 (discussing historical background of right to appeal). The clause appears not as an enumer-

ated right in Article I but as a restriction on our rule-making authority in Article VII. Because neither of the parties fully briefed these matters, we decline in this case to demarcate the scope of § 6.

15. *See generally* Gary Stein, Note, *Expanding the Due Process Rights of Litigants: Will Texaco Trickle Down?*, 61 N.Y.U.L.Rev. 463, 494 (1986) (Some state procedural entitlements are adopted because they "reflect[ ] society's notion of what is fair and appropriate process.").

16. This holding was prefigured by our January 24, 1992, amendment of Appellate Rule 3(A) to the effect that the appellate filing fee "is not applicable in a case prosecuted as a pauper cause."

cation granted. Appellee would have us go farther, urging that we augment this standard with a requirement that applicants make a showing as to the objective merit, or at least lack of frivolousness, of their case on appeal. We are unpersuaded, however, that the incidence of fraud by indigent appellants will be high or that trial courts ought be placed in the awkward position of having to make such determinations. Therefore, we decline petitioner's invitation to require anything more than a showing of indigency.[17]

We emphasize, however, that each litigant wishing to proceed on appeal *in forma pauperis* must make this showing. This includes those permitted to proceed at trial under § 33–19–3–2, who must reapply in order to retain their pauper status on appeal.[18] As to this point, we reiterate our holding in *Meeker v. State* (1979), 182 Ind. App. 292, 302 & n. 5, 395 N.E.2d 301, 307 & n. 5, that the standard governing a finding of indigency is closely related to the purpose for which the status is sought. *See also Moore v. State* (1980), 273 Ind. 3, 7, 401 N.E.2d 676, 678 (Consideration of pauper application should be commensurate with the right at stake.).

■■ We are unable to say that a finding of indigency under § 33–19–3–2 necessitates permitting an applicant to proceed on appeal *in forma pauperis*, the right at stake under the former being more deeply established than that of the latter. The determinations are related, but independent, and are to be left to the discretion of the courts for review under the procedures outlined in *Offutt v. Sheehan* (1976), 168 Ind.App. 491, 344 N.E.2d 92, which we now adopt.[19] *See also Campbell*, 588 N.E.2d 513 at n. 3.

## E. Conclusion

Thirty years ago this state was favored by Justice Stewart's majority opinion in *Lane v. Brown*: "In the administration of its criminal law, Indiana seems to have long pursued a conspicuously enlightened policy in the quest for equal justice to the destitute." 372 U.S. 477, 478, 83 S.Ct. 768, 769, 9 L.Ed.2d 892 (1963). Judge Baker, writing for the Court of Appeals, correctly gauged this spirit when he wrote: "Arbitrary economic discrimination in the halls of justice is wrong." *Campbell*, 588 N.E.2d at 518. In light of this, and the admixture of statute, common law power, and constitutional obligation described above, we hold that Indiana courts have authority to make those orders which will ensure that a party is not denied, by reason of indigency, access to that appellate process which the law would otherwise afford.

■■ Thus, if Campbell possessed the requisite level of indigency, he was entitled to have his *in forma pauperis* application granted. Indigency determinations present a subject for the sound discretion of the trial court, *Moore*, 273 Ind. at 7, 401 N.E.2d at 678, and a very clear case of abuse must be shown before this discretionary power can be interfered with. *Hoey v. McCarthy*, 124 Ind. at 465–66, 24 N.E. at 1038. A search of the record in this case, however, presents no valid ground upon which the

17. In making his argument, Petitioner relies on dicta in *Hoey*, 124 Ind. 464, 24 N.E. 1038. We pause to note that, with respect to costs and fees, hindsight calls into doubt our assertion there that "it can rarely happen that any one with a good claim will be deprived of his legal right" since "[t]here is probably no profession where benefactions to the poor, in the way of ... material respects, exceed those of the legal profession." *Id.* at 466, 24 N.E. 1038. Nonetheless, we are not, by way of this holding, shrinking from our "duty not to encourage unnecessary and fruitless litigation," *id.*, and we note that Ind.Code Ann. § 34–1–1–4 (West 1983), permits a court, in its discretion, to vacate an order admitting a party to proceed on appeal *in forma pauperis.*

18. Campbell did not apply for indigent status when he initiated his lawsuit. He seeks it for purposes of appeal only.

19. Trial courts have the authority and the duty to rule on motions to proceed on appeal *in forma pauperis*, at least where a statement of the evidence or proceedings is sought. *See infra.* Nonetheless, we understand *Offutt* as recognizing that it is solely within the province of the appellate courts to waive appellate fees and costs. A trial court's determination of indigency is, however, customarily considered by appellate courts to be highly probative.

Verified Motion could have been denied. Campbell is, by any standard, indigent. He is unemployed due to physical disability, has no bank account, owns no real estate, and relies on government assistance. The denial of his Verified Motion, therefore, constituted an abuse of discretion by the trial court.

## II. What Is the Entitlement of an Indigent on Appeal?

Campbell next asks us to find that, as a matter of law, a pauper civil appellant is entitled to have the record of proceedings, including a transcript of the evidence, prepared at public expense. In reviewing the matter we apply the standard articulated above, namely, whether failure to provide a pauper appellant with a record of the proceedings *gratis* is tantamount to denying the party, by reason of indigency, access to that process to which the party would otherwise have claim.

The Rules of Appellate Procedure require appellants to provide reviewing courts with a record of the proceedings sufficient to disclose the issues asserted on appeal. Ind.Appellate Rules 3 & 7.1; *Moore v. State* (1981), Ind.App., 426 N.E.2d 86. Failure to provide this record is fatal to an appeal, depriving the reviewing court of jurisdiction. *See, e.g. Hepp v. Hammer* (1982), Ind.App., 439 N.E.2d 735. Generally, a transcript of the evidence and proceedings at trial must be included in the record for it to be deemed sufficient. *See* App.R. 7.2(A). Although not fatal to the appeal, *Quinn v. State* (1972), 258 Ind. 399, 281 N.E.2d 478, failure to include a transcript works a waiver of any specifications of error which depend upon the evidence. *Registration & Management Corp. v. City of Hammond* (1972), 151 Ind.App. 471, 280 N.E.2d 327.

Our experience tends to confirm the Court of Appeals' assertion that the expense of preparing transcriptions often runs in the hundreds or thousands of dollars, thereby exceeding even the appellate filing fee. Clearly, costs of this magnitude would be prohibitive to most indigent appellants. As such, we agree that the failure

to accommodate paupers in this regard would be tantamount to denying them, by reason of their indigency, access to process upon which they would otherwise have claim. This finding does not dictate, however, the conclusion that indigent civil appellants are entitled to have a complete record of the proceedings, including a transcription, prepared for them at public expense.

We think our appellate rules afford a narrowly tailored solution. Appellate Rule 7.2(A)(3)(c) provides a mechanism for presenting a record to an appellate court in the event that "no report of all or part of the evidence or proceedings at the hearing or trial was or is being made, or if a transcript is unavailable." In such cases, a party may prepare a statement of the evidence of proceedings from the best available means, including his recollection. *Id.* The trial court has the duty to approve and settle such statements and once it has done so, it becomes a part of the record. *Id.; Herrera v. Collection Serv.* (1982), Ind. App., 435 N.E.2d 88, 90. We agree with *amicus curiae* Marion County, Indiana, that this mechanism should also be made available to indigent appellants seeking to perfect their appeals.

We have typically relied on Rule 7.2(A)(3)(c) when a transcription of the evidence is unavailable due to equipment failure or the destruction of records. *See, e.g., Wilburn v. State* (1986), Ind.App., 499 N.E.2d 1173, 1175 (defective audio tape). We think that physical unavailability of transcript need not be the sole fact which will trigger the rule. Rather, we hold that a transcript is also unavailable for purposes of App.R. 7.2(A)(3)(c) when an indigent is unable to bear the costs of its preparation. *Accord State ex rel. Motley v. Capers*, 23 Ohio St.3d 56, 491 N.E.2d 311 (1986).

Granting an application to proceed *in forma pauperis* does entitle the pauper to special accommodation with respect to creation of the record. As far as transcription of the evidence is concerned, that accommodation should center on the utilization of Appellate Rule 7.2(A)(3)(c). Agreed state-

ments, as provided for in Appellate Rule 7.3, may also be an acceptable alternative. We believe that resort to one of these two mechanisms will enable most appellants to perfect their appeals. Moreover, we believe these mechanisms strike the proper balance between our obligation to protect the procedural entitlements of indigent suitors and the legitimate fiscal needs of our counties. When one of these methods proves inadequate in a particular case, trial courts may authorize additional accommodations, including transcripts, to assure indigents the right of appeal.

Order

 We direct that Campbell be admitted to appeal *in forma pauperis.* Campbell, however, failed to demonstrate that his appeal could not have been perfected through the preparation of a statement of the evidence and proceedings as contemplated by Rule 7.2. Therefore, we affirm the trial court's refusal to order a transcription of the evidence at public expense.

DeBRULER, GIVAN, DICKSON and KRAHULIK, JJ., concur.